IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

HYDRONIC ENERGY V. RENTZEL PUMP MFG.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

HYDRONIC ENERGY, INC., APPELLEE,
V.
RENTZEL PUMP MANUFACTURING, LP, APPELLANT.

Filed October 29, 2013.    No. A-12-828.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

James B Luers and Krista M. Carlson, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellant.

E.J. Kelly and Patrick T. Vint, of Hopkins & Huebner, P.C., for appellee.

INBODY, Chief Judge, and IRWIN and RIEDMANN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Rentzel Pump Manufacturing, LP (Rentzel), appeals from an order of the district court for Douglas County. After a bench trial, the district court found that Rentzel had breached the warranty it provided to Hydronic Energy, Inc. (Hydronic), that Hydronic had provided timely and sufficient notice of defective products, that there was a failure of the essential purpose of the warranty, and that Hydronic was entitled to damages. Because we find there was competent evidence to support the district court's findings, we affirm.

## II. BACKGROUND

In 2007, Hydronic purchased a vertical turbine pump assembly from Rentzel to be installed in a new addition at a hospital in Omaha, Nebraska. The pump was to be used as part of the air conditioning system in order to cool the surgical rooms at the hospital. The pumps were designed to pump water from a pit to the cooling towers which then cool the chilled water so the

chillers can create air conditioning for the surgical rooms. When the external temperature reaches 40 degrees, the pumps need to be working so that the chillers can be turned on. The pump was delivered and installed without incident.

In April 2008, Hydronic purchased two more identical pumps from Rentzel, referred to as "CTP-2" and "CTP-3." These two pumps were shipped on May 16, 2008. They were shipped partially assembled so that they would fit inside the building. In order for the pumps to be operational, they had to be put into the ground, reassembled, have a motor attached, and be wired to electricity. The pumps were assembled between May 27 and June 4, 2008, and started on May 21, 2009. CTP-2 "went online" on June 1, and CTP-3 "went online" on August 8.

Rentzel sold the pumps to Hydronic subject to a limited warranty, which provided:

> [Rentzel] warrants to [Hydronic] on that products, materials and supplies ("Products") manufactured by [Rentzel] when properly installed, used and maintained, shall be free from defect in material and workmanship ("Defects["]). [Rentzel's] obligation under this warranty shall be limited to replacing or repairing the part or parts ("Warranty Service"), at [Rentzel's] option, which prove to contain Defects within twelve (12) months from the date of installation or fifteen (15) months from the date of shipment, whichever occurs first, provided that [Hydronic] gives [Rentzel] notice as hereinafter provided of any Defects and satisfactory proof thereof ("Warranty Claims"). Warranty Claims by [Hydronic] must be submitted to [Rentzel] or [Rentzel's] authorized representative, in writing, within thirty (30) days after the later of the pulling date or failure date of Products. Any defective part or parts, except for surface electronics, will be performed at the site of installation [sic]. Parts for which Seller provides replacement under this warranty shall become the property of Seller.

The agreement also included a limitation of liability, which provided, "In no event shall [Rentzel] be liable, either directly or indirectly, for any special, incidental or consequential damages including, but not limited to . . . costs and expenses incurred in connection with labor, overhead, transportation or substitute facilities or supply sources."

On August 12, 2009, Clint Kmoch, a salesman for Hydronic, e-mailed Tom Hogan, a product manager at Rentzel, notifying him that the motors in CTP-2 and CTP-3 were "running hot" and "over amping." Kmoch asked Hogan what the normal temperature and maximum temperature for the motors should be. Hogan responded the same day. The following month, Hogan e-mailed Jack Trisler, a sales manager for Hydronic, with the specifications for the pumps. In December, Kmoch contacted Hogan again about the motors in CTP-2 and CTP-3 running hot and over amping. Kmoch suggested that perhaps the impellers were trimmed to a size other than what was specified. The parties then continued to exchange e-mails in an attempt to diagnose the problem with the pumps.

In late January 2010, Trisler asked Ray Martin Company (Ray Martin), the mechanical engineer on the hospital project, for an estimate of the cost to remove and disassemble the pumps, replace the impellers, and reassemble the pumps. Trisler testified at trial that he requested this estimate because of the urgency of getting the pumps repaired before the external temperature reached 40 degrees, the baseline outdoor temperature at which the chillers were

needed. At this time, the engineer and plant manager from the hospital continued to express concern over the temperature nearing 40 degrees.

Trisler sent Ray Martin's estimate to Hogan, and Hogan responded on February 1, 2010. Hogan stated that it was Rentzel's position that the problems with the pumps were not covered by the limited warranty due to lack of timely notice. At this point, Hydronic and Ray Martin believed the problem with the pumps was the result of improperly trimmed impellers. On February 5, Hogan again contacted Trisler and iterated Rentzel's position that the warranty had expired; however, Rentzel made the following offer:

> If, after all other possible causes of the problems are eliminated, it is found necessary to remove the units, we strongly recommend a teardown inspection of the pumps at our facility. Should any pump assembly or manufacturing problems be discovered, those problems will be corrected, without waiver of the terms and conditions of our warranty, in an expeditious manner at no charge.

After another month of troubleshooting with Rentzel, Hydronic finally asked Ray Martin to remove the pumps for inspection. Ray Martin disassembled the pumps, removed the impellers, and took the impellers to America Machine Works, which discovered the impellers had been trimmed to 10.41 inches instead of 9.41 inches. American Machine Works trimmed the impellers to the proper size, and Ray Martin reassembled the pumps. After the impellers were trimmed and reinstalled, the pumps performed without further incident.

On March 22, 2010, Hydronic submitted the invoices from Ray Martin and American Machine Works to Rentzel. On May 21, Rentzel responded to the invoices and reiterated its position that notice of a defect was untimely and therefore not covered by the limited warranty.

Hydronic commenced this action on October 19, 2010. Following a bench trial, the district court resolved all issues in favor of Hydronic. The district court found that a defect in the pumps was present, because the impellers were not trimmed to the specified size, and that therefore, the warranty was implicated. The court determined that the warranty expired on August 16, 2009, 15 months after shipment, and that the August 12 e-mail constituted a timely, valid warranty claim under the terms of the limited warranty. The court found that the limited warranty failed in its essential purpose, and thus, Hydronic's damages were not limited to the cost of repairing or replacing the defective part. Finally, the district court found that Hydronic incurred $17,818.39 in expenses and was entitled to recover that amount from Rentzel.

Rentzel moved for a new trial, which the district court denied. Rentzel timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Rentzel assigns, condensed, renumbered and restated, that the district court erred in (1) finding that Hydronic gave timely and sufficient notice of a warranty claim, (2) finding that Rentzel breached the limited warranty, (3) finding that the limited warranty failed in its essential purpose, (4) calculating the amount of damages to which Hydronic was entitled, and (5) failing to grant Rentzel a new trial.

## IV. ANALYSIS

The purchase contract provides that it "shall be construed, interpreted and governed in accordance with the laws of the State of Oklahoma." We will therefore apply Oklahoma law to resolve the issues before us.

### 1. TIMELINESS AND SUFFICIENCY OF NOTICE

#### (a) Timeliness of Notice

Rentzel argues that the district court erred in failing to find that the warranty expired on June 4, 2009, a year from the date that it alleges installation of the pumps was complete. Pursuant to the terms of the agreement, the limited warranty was to expire 12 months from the date of installation or 15 months from the date of shipment, whichever occurred first. It is undisputed that the pumps were shipped on May 16, 2008, and that thus, if the "shipping date" provision of the warranty applies, the warranty expired on August 16, 2009. The parties disagreed on the date on which the warranty expired using the "installation date," however, because they did not agree upon what constituted "installation."

The first step in addressing a dispute over the language in a contract is for the court to determine as a matter of law whether the language is ambiguous. *Andres v. OFB*, 227 P.3d 1102 (Okla. Civ. App. 2009). Neither party in this case argues that the term "installation" is ambiguous, nor do we find it to be so. As such, the meaning of the term is a question of law and it should be given effect according to its plain and ordinary meaning. See, *Ferguson Advisors, LLC v. Malherbe*, 274 P.3d 839 (Okla. Civ. App. 2011); *B.A.P., L.L.P. v. Pearman*, 250 P.3d 332 (Okla. Civ. App. 2011).

Issues of law are reviewed de novo since an appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings. *K & H Well Service, Inc. v. Tcina, Inc.*, 51 P.3d 1219 (Okla. 2002). Thus, we will review de novo the meaning of the word "installation."

According to the evidence presented at trial, the pumps were "assembled" between May 27 and June 4, 2008, and "started" on May 21, 2009. CTP-2 "went online" on June 1, 2009, and CTP-3 "went online" on August 8. Trisler testified that in order for the pumps to be fully installed, they have to be put into the ground, reassembled, have a motor attached, and be wired to electricity. Ray Martin's area foreman who was responsible for the pumps' installation testified that the pumps were not fully operational until the electrical was hooked up, and he considered the installation process complete when "the user was using it." The evidence does not reveal the exact date on which the electrical was hooked up, but it would have occurred no later than May 21, 2009 when the pumps were "started."

Rentzel claims that the pumps were "installed" by June 4, 2008, the date on which the last pump was "assembled." It claims the trial court erred in finding that installation required the pumps to be hooked up to power and turned on, rather than "simply assembled and put into place where they would operate, which is the ordinary understanding of the term 'installation.'" Brief for appellant at 16. Rentzel argues that the "'natural meaning of the word "install" in common usage is simply "to put in place."'" Reply brief for appellant at 1, quoting *Crystal Apartments Group v. Cook*, 147 Misc. 2d 676, 558 N.Y.S.2d 786 (N.Y. Civ. 1990).

In *Crystal Apartments Group*, the court found that a tenant had violated a provision in her lease prohibiting installation of a washing machine by bringing the washing machine into her apartment and making use of the plumbing facilities to operate it. Therefore, contrary to Rentzel's interpretation of *Crystal Apartments Group*, the court did not define "installation" to mean "bringing in," but, rather, also required the "making use of the plumbing facilities to operate it." See 147 Misc. 2d at 677, 558 N.Y.S.2d at 787.

Applying this interpretation to the case at hand, simply assembling and putting the pumps into place is insufficient to constitute "installation." We note that Webster's also defines "install" as requiring action beyond just placement as it defines "install" to mean "to place . . . in position for service or use." Webster's Encyclopedic Unabridged Dictionary of the English Language 736 (1989).

Upon our de novo review, we find that the word "installation," in its plain and ordinary meaning, required that the pumps be assembled, placed, hooked up to electricity, and ready to use. Therefore, we reject Renzel's argument that the trial court erred in failing to use June 4, 2008, as the date of installation. The trial court, therefore, did not err in applying the "shipping date" deadline as opposed to the "installation date" deadline, since the shipping date deadline of August 16, 2009, would have occurred first.

(b) Sufficiency of Notice

Having concluded that the trial court did not err in finding that the warranty did not expire until August 16, 2009, we must now determine whether the trial court erred in determining that the August 12 e-mail provided sufficient notice of a defect. The meaning of the word "defect" is a question of law, which we review de novo. See, *Ferguson Advisors, LLC v. Malherbe*, 274 P.3d 839 (Okla. Civ. App. 2011); *B.A.P., L.L.P. v. Pearman*, 250 P.3d 332 (Okla. Civ. App. 2011). The sufficiency of notice is a question of fact, based upon the circumstances in each case. *American Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592 (Okla. 1981). When a case is tried to the court, its determination of facts are accorded the same force as those made by a well-instructed jury; if any competent evidence supports the trial court's findings of fact, the same will be affirmed. *K & H Well Service, Inc. v. Tcina, Inc.*, 51 P.3d 1219 (Okla. 2002).

Rentzel argues that the notice was insufficient, because at the time it was sent, Hydronic did not even know if there were any defects with the pumps. Rentzel argues that the purpose of the e-mail was a conveyance of information and request for additional information, not a request to repair or replace a defective part. We conclude that the specific language of the limited warranty requiring Hydronic to provide notice of a defect required only that Hydronic advise Rentzel that the product was not working as warranted, and to provide proof that it was not. The trial court found that Hydronic met this obligation by advising Rentzel that the motors were "running hot" and "over amping." We agree.

In reaching this conclusion, it is important to point out that the limited warranty required Hydronic to provide notice of a defect, not notice of a breach of warranty. "[N]otice of defects is not a notice of breach of warranty." *Charles v. Judge & Dolph, Ltd*., 263 F.2d 864, 868 (7th Cir. 1959). To the extent that a notice of breach of warranty requires a demand for repair, the express warranty in this case did not contain that requirement. Rather, we focus on the requirement that notice of a "defect" be provided. The Oklahoma Uniform Commercial Code (UCC) does not

define the word "defect." Three other sections of the Oklahoma statutes define the word, and although none deals with the sale of goods, they are instructional in that they refer to a defect as either a "deficiency" or a "condition, malfunction or problem." See, Okla. Stat. Ann. tit. 12, § 1141.2 (West Cum. Supp. 2013); Okla. Stat. Ann. tit. 15, § 765.6 (West 2013); Okla. Stat. Ann. tit. 60, § 832 (West 2010). These definitions are in line with the plain and ordinary meaning of "defect," which is a "want or lack . . . of something essential to perfection or completeness; deficiency." Webster's Encyclopedic Unabridged Dictionary of the English Language 378 (1989).

The e-mail sent from Hydronic on August 12, 2009, informed Rentzel that the pumps were "running hot" and "over amping." This e-mail formed the basis for the correspondence between the parties over the next 7 months attempting to diagnose the problem with the pumps. Ultimately, through much investigation, Ray Martin determined that the improper size of the impellers was causing the pumps to "run hot" and "over amp." Renzel argues that the August 12 e-mail provided neither proof of a defect nor notice of one. We disagree.

The limited warranty does not specify what constitutes sufficient notice or "satisfactory proof" of a defect. Absent any such requirement, we determine that the trial court did not err in finding that Hydronic provided sufficient notice and satisfactory proof of the defect. See *SNC-Lavalin America v. Alliant Techsystems, Inc*., 858 F. Supp. 2d 620 (W.D. Va. 2012) (holding that inclusion of pump and control valves on punch list was adequate notice of defect where contract did not specify the type of notice required). See, also, *Christensen v. Hoskins*, 65 Wash. 2d 417, 418, 397 P.2d 830, 831 (1964) (holding that notice of plaster cracking and utility room being in "'bad condition'" was sufficient notice of defects).

As of August 12, 2009, Hydronic knew something was wrong with the pumps, but had not isolated the cause, due to its latent nature. On this date, it alerted Rentzel of the problem, and the trial court found that this communication was sufficient notice of a defect. It also determined that the information provided was the "satisfactory proof" the limited warranty required. Since competent evidence supports the trial court's findings of fact, we affirm its determinations.

## 2. BREACH OF WARRANTY

Rentzel assigns as error the district court's finding that it breached the limited warranty, but does not argue that assigned error. "Propositions of error unsupported by argument or citation of authority in the brief are not considered on appeal." *Matter of Death of Boyd*, 889 P.2d 1276, 1278-79 (Okla. Civ. App. 1994). An argument in a brief which is unsupported by citation of authority is not sufficient to overcome the presumption in favor of the correctness of the trial court's decision and will not be considered. *Id*. Because Rentzel does not argue the assigned error, we will not consider it.

## 3. ESSENTIAL PURPOSE

Rentzel next argues that the district court erred in finding that the limited warranty failed in its essential purpose. A warranty fails in its essential purpose when the seller is afforded a reasonable opportunity to correct a defect but fails to timely respond or is repeatedly unsuccessful in the efforts to meet the warranty-imposed obligation. *Osburn v. Bendix Home Systems, Inc.*, 613 P.2d 445 (Okla. 1980). When a warranty fails in its essential purpose, the

buyer is then free to invoke any of the broader remedies available under the UCC. *Id*. See, also, Okla. Stat. Ann. tit. 12A, § 2-719 (West 2004). In order to determine whether the limited warranty in this case failed in its essential purpose, we must first ascertain the obligation imposed upon Rentzel by the warranty.

The contract here was a standard contract prepared by Rentzel and included Rentzel's standard terms and conditions. Under the limited warranty, Rentzel had a duty to provide conforming goods. If the goods were defective, Rentzel was obligated to repair or replace any defective parts. Ascertaining the meaning and scope of Rentzel's obligation is complicated by the provision of the warranty which provides, "Any defective part or parts, except for surface electronics, will be performed at the site of installation." As written, this sentence is incomplete.

Standardized contracts, such as that at issue here, that are not the result of bargaining between the parties are called adhesion contracts. See *Bilbrey v. Cingular Wireless, L.L.C.*, 164 P.3d 131 (Okla. 2007). The services that are the subject of the contract cannot be obtained except by acquiescing to the form agreement. *Id*. In adhesion contracts, there is no adjustment of rights of the parties; the contract is on a take-it-or-leave-it basis. *Id*. Contracts of adhesion are to be construed most strongly against the drafter. *Towe, Hester & Erwin v. KC Fire Ins.*, 947 P.2d 594 (Okla. Civ. App. 1997).

In construing the limited warranty against Rentzel, we agree with the trial court that Rentzel had a duty to repair or replace defective parts at the site of installation. Because Rentzel was unwilling to repair the impellers unless Hydronic diagnosed the problem, disassembled the pumps, and shipped them back to Rentzel, the limited warranty failed in its essential purpose, and the additional remedies available under the UCC became available to Hydronic. As such, the district court did not err in finding that the warranty failed in its essential purpose and allowing Hydronic to recover damages for more than the cost of repairing the impellers.

Rentzel also assigns that the district court erred in (1) finding that Rentzel directed a significant part of the investigation into the cause of the failure of the pumps to perform as specified; (2) failing to find that under the warranty Rentzel was not liable for any repairs, service, or rebuilding done outside Rentzel's plant; and (3) finding that Hydronic needed to have the pumps repaired locally due to time constraints. Because we agree with the district court's ultimate conclusion that the warranty failed in its essential purpose, we need not address the additional assigned errors. See *Adibi v. Prestigious Homes*, 55 P.3d 465 (Okla. Civ. App. 2002) (appellate court declines to answer questions disconnected from the granting of relief or from which no practical result will follow).

4. DAMAGES

Rentzel argues that the district court erred in failing to apply the consequential damages exclusion and awarding damages not supported by the evidence. We address each argument separately.

(a) Consequential Damages Exclusion

In Oklahoma, if a limited remedy fails in its essential purpose, the buyer is entitled to all remedies under the UCC, including consequential and incidental damages. *Anderson v. Dow Agrosciences LLC*, 262 F. Supp. 2d 1280 (W.D. Okla. 2003); *Osburn v. Bendix Home Systems,*

*Inc.*, 613 P.2d 445 (Okla. 1980); *Collins Radio Co. of Dallas v. Bell*, 623 P.2d 1039 (Okla. Civ. App. 1980). We recognize that the case relied on by the Oklahoma Supreme Court in *Osburn* has been abrogated. See *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 854 N.E.2d 607, 305 Ill. Dec. 15 (2006), *cert. denied* 549 U.S. 1181, 127 S. Ct. 1156, 166 L. Ed. 2d 996 (2007), *abrogating Adams v. J. I. Case Co.*, 125 Ill. App. 2d 388, 261 N.E.2d 1 (1970). Nonetheless, we must follow the current state of Oklahoma law as pronounced by the state's highest court, which allows recovery of all remedies available under the UCC. See *Dayton v. Peck, Stow and Wilcox Co. (Pexto)*, 739 F.2d 690 (1st Cir. 1984) (we must apply law of forum as we infer it presently to be, not as it might come to be). We further note that at the time the Oklahoma Supreme Court decided *Osburn*, other courts had determined that a limitation of liability clause excluding consequential and incidental damages was still enforceable even though a limited warranty failed in its essential purpose. See, e.g., *S. M. Wilson & Co. v. Smith Intern., Inc.*, 587 F.2d 1363 (9th Cir. 1978); *AES Technology Systems, Inc. v. Coherent Radiation*, 583 F.2d 933 (7th Cir. 1978); *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F. Supp. 1300 (S.D.N.Y. 1970). Oklahoma apparently chose not to follow those cases when deciding *Osburn*.

As a result, we conclude that the district court did not err in awarding damages under Oklahoma law to Hydronic for expenses other than the cost of repairing the pumps.

### (b) Evidence as to Damages

Rentzel also claims that the damages awarded to Hydronic are not supported by the evidence. The amount of damages to award is a question for the fact finder. *B-Star, Inc. v. Polyone Corp.*, 114 P.3d 1082 (Okla. 2005). Where the amount of a verdict is within the limits of the evidence, an appellate court will not invade the fact finder's province and substitute its judgment as a factfinding tribunal. *Id*.

The district court awarded damages in the amount of $17,818.39, which included the cost of Ray Martin employees' time spent investigating the cause of the pump problems and the cost for American Machine Works to disassemble the pumps and trim the impellers.

The Ray Martin and American Machine Works invoices were received into evidence without objection, but Rentzel now claims that there is insufficient evidence to support the damage award, because Ray Martin's area foreman who was responsible for the pumps' installation was not able to explain what all of the Ray Martin employees were doing during the hours charged. Rentzel did not assert a foundational objection to the invoices at trial, and the current argument simply challenges the weight to be given to the invoices, which is a decision solely for the fact finder. The district court found the invoices sufficient to support Hydronic's requested damages, and because there is competent evidence in the record to support the amount of damages awarded, we affirm.

### 5. NEW TRIAL

Rentzel assigns that the district court erred in denying its motion for new trial. Because we conclude that the district court did not err in its resolution of the above issues, we find that Rentzel was not entitled to a new trial. This assignment is without merit.

## V. CONCLUSION

Based on the foregoing, we conclude that the district court did not err in finding that the warranty expired on August 16, 2009, and that the August 12 e-mail constituted a valid, timely warranty claim. Further, we conclude that the limited warranty failed in its essential purpose, and therefore, Hydronic was entitled to all other damages allowed under the UCC. We find that there is competent evidence to support the amount of damages awarded. Accordingly, we affirm the decision of the district court.

AFFIRMED.