FILED
United States Court of Appeals
Tenth Circuit

April 13, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND
SERVICE WORKERS
INTERNATIONAL UNION, and its
Local 13-857, a labor organization,

        Plaintiff-Appellant,

v.

CONOCOPHILLIPS COMPANY, a
foreign corporation,

        Defendant-Appellee.

No. 09-5143
(D.C. No. 4:07-CV-00316-GKF-PJC)
(N.D. of Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **BALDOCK**, and **TYMKOVICH**, Circuit
Judges.

This is an appeal from the district court's denial of arbitration for a number

of grievances arising from various organizational changes made by

ConocoPhillips in its oil refinery in Ponca City, Oklahoma. The United Steel

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Workers' International Union and its Local 13-857 challenged these changes as violating the Collective Bargaining Agreement (CBA) between the Union and ConocoPhillips, and sought an order to compel arbitration of its grievances. The Union now appeals the district court's finding that these grievances are exempt from arbitration under the CBA. We conclude the grievances concerning the elimination of jobs as part of the reorganization are exempt from arbitration. But we also conclude several of the grievances regarding work reassignments are eligible for arbitration.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM in part and REVERSE in part.

## I. Background

The Union is the collective bargaining representative for many employees of this ConocoPhillips oil refinery. Union employees are organized into "progression units" composed of one or more job positions, or "classifications."

ConocoPhillips and the Union are party to a CBA that covers a wide range of matters pertaining to wages, hours, discipline, and other conditions of employment. It also lays out a three-step process for resolution of disputes that arise under the CBA. The first two steps involve discussions between Union representatives and escalating levels of management within ConocoPhillips. If the parties cannot resolve a grievance after the first two steps of the process, either party may advance the grievance to the final step, arbitration. The CBA

broadly provides that "differences arising between the Union and the Company relating to interpretation or performance of this Agreement . . . are arbitrable, except as otherwise provided by this Agreement."  App. at 284.

But not all grievances are arbitrable.  Article 11 of the CBA, entitled "Management's Rights," commits certain decisions to ConocoPhillips's discretion:

> Other responsibilities, solely those of Management are:  *the assignment of work subject only to the other provisions of this Agreement . . . the determination of the number of persons required to operate and maintain any portion or all of the physical plant . . .* the decision to operate, determine the level of operation, or to shut down any portion or all of the plant . . . . to determine and to redetermine the organization of the Ponca City Refinery . . . to determine the methods, processes and materials to be employed; to discontinue in whole or in part processes or operations.

*Id.* at 260 (emphasis added).  Article 11 further provides that disputes arising from these decisions are exempt from arbitration:  "*Grievances originating under Article 11 are subject to the grievance procedure but cannot be submitted to arbitration; and no arbiter has the authority to rule on Article 11 . . . .*"  *Id.* (emphasis added).

In 2006, ConocoPhillips made several organizational changes in the refinery to improve operating efficiencies.  It eliminated a position known as the Lead Operator, which was primarily responsible for maintaining a safe workplace, performing limited administrative duties, and assisting other operators as needed. The bulk of the duties previously performed by the Lead Operator were then

redistributed to the existing Unit Operator position. In addition, some supervisory duties were reassigned to the newly created Area Production Supervisor (APS) position, a non-Union position that provides day-to-day guidance to Unit Operators to ensure operations are safe, environmentally sound, and consistent with the company business plan. ConocoPhillips did not terminate the twenty-five Lead Operators whose jobs were eliminated, but rather moved them into Unit Operator or APS positions. After the reorganization, the Union filed multiple grievances contending the elimination of the Lead Operator position and the reassignment of work violated a number of provisions of the CBA.

In addition to the elimination of the Lead Operator position, ConocoPhillips also reorganized the Still Cleaner unit. Workers in this unit are responsible for cleaning out the coke still equipment between batch operations. In the past, cleanouts were performed by a three-member crew composed of a Cleaner, a Sluicer, and a Helper. With the stated purpose of improving safety, ConocoPhillips merged these three positions into one general Still Cleaner position, and assigned two Still Cleaners to each cleanout. Again, ConocoPhillips did not terminate affected employees, but instead transferred them to other positions in the refinery. Relatedly, ConocoPhillips reassigned some aspects of the cleanout preparation work previously performed by the eliminated positions to the newly created Drum Operator position within the Coker/Combo unit. This

-4-

position is now filled by Unit Operators in the Coker/Combo unit who rotate through the position on a weekly basis. The Union filed grievances challenging the elimination of the three original Still Cleaner positions and the reassignment of work as a violation of multiple provisions of the CBA.

At about the same time, ConocoPhillips eliminated a Tester position in the Control Laboratory unit that was vacated when an employee was promoted to another position. ConocoPhilips asserts improved efficiencies as a result of the reorganization made the individual position unnecessary. The Union also submitted grievances over the elimination of the Tester position and the alleged reassignment of work as violating several provisions of the CBA.

ConocoPhillips denied each of the Union's grievances at the first and second steps of the dispute resolution procedure, leading the Union to demand arbitration. ConocoPhillips declined to arbitrate on the theory that each of the grievances arises under the management rights section of Article 11 and is therefore exempt from arbitration.

The Union filed this action to compel ConocoPhillips to arbitrate the grievances. The district court granted ConocoPhillips's motion for summary judgment after concluding Article 11 expressly exempts the Union's grievances from arbitration. This appeal followed.

## II. Discussion

On appeal, the Union challenges the dismissal on two grounds.  First, the Union argues the district court improperly considered the merits of the grievances in addressing their arbitrability under the CBA.  And second, it contends the district court erred in concluding the grievances were not arbitrable.

We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court.  *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When applying this standard, we review the evidence and draw inferences in the light most favorable to the nonmoving party.  *See Byers*, 150 F.3d at 1274.

It is well settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Local 5-857 Paper, Allied-Industrial, Chemical and Energy Workers Int'l Union v. Conoco, Inc.*, 320 F.3d 1123, 1126 (10th Cir. 2003) (quotation omitted).  But in considering whether a contract requires the parties to resolve a particular grievance in arbitration, the court must not rule on the potential merits of the underlying claim.  *Id.*  A grievance may be arbitrable even if it is frivolous or unlikely to succeed.  *AT&T Techs., Inc. v. Commc'ns Workers of America*, 475

U.S. 643, 649–50 (1986). Thus, the question for a court considering an action to compel arbitration is not whether the contract gives support for the underlying grievances, but whether the contract requires the parties to arbitrate those grievances. *See id.*

Where a collective bargaining agreement includes an arbitration clause, there is a presumption of arbitrability. *Local 5-857 Paper*, 320 F.3d at 1126. Arbitration should be denied only where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quotation omitted). Where the arbitration clause is broad, only an express exemption provision or otherwise forceful evidence of purpose to exclude the claim from arbitration will prevail. *Id.* A broad clause, such as the one in this case, "refers all disputes arising out of a contract to arbitration." *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005) (quotation and alteration omitted).

### A. The District Court's Decision

Because the CBA's arbitration clause is broad, the question before the district court was whether Article 11 expressly exempts the Union's grievances from arbitration. In making this determination, the court began with a review of Article 11. It noted Article 11 exempts a number of management decisions from arbitration absolutely. But this article creates one exception in stating assignment of work is committed to management's discretion "subject only to other

provisions of this agreement." App. at 260. The court therefore concluded that, in order to determine whether a reassignment grievance is expressly excluded from arbitration, it must consider whether any other CBA provisions are implicated by the company's action. The court interpreted this exception broadly, to include both any reassignment and any other managerial decision that "involves" reassignment. As a result, the court performed this analysis not only for each of the reassignment-of-work grievances, but also for each of the elimination-of-jobs grievances.

After careful review of each of the CBA articles cited by the Union, the court concluded that none are implicated by the reassignment-of-work and elimination-of-jobs grievances. It therefore found these grievances are expressly exempted from arbitration by Article 11. The court also held that, where reassignment-of-work is not involved, elimination-of-jobs grievances are absolutely exempted from arbitration by Article 11. Finally, the court found as a factual matter that ConocoPhillips did not reassign the work previously performed by the Tester position, and disposed of this grievance on separate grounds.

### B. Interpretation of the CBA

The Union contends the district court should have determined whether the grievances are exempt from arbitration by looking only to Article 11, and the court performed an inappropriate merits review by considering whether each article cited by the Union actually applies to each grievance.

-8-

We agree in part and disagree in part with the district court's conclusions on this point. Because we find the CBA requires different analyses for the reassignment-of-work and elimination-of-jobs grievances, we address the Union's challenge as to each separately.

*1. Reassignment-of-Work*

The district court's method of analysis in considering the reassignment-of-work grievances was correct under the CBA. The court's review of other articles of the CBA to determine whether they apply to each reassignment grievance is consistent with the language of the agreement. Article 11 explicitly makes the exemption for assignment conditional on the other provisions of the CBA. The district court's method also comports with our reasoning in interpreting a similar collective bargaining agreement between these same parties. *See Oil, Chemical and Atomic Workers Int'l Union Local 5-391 v. Conoco, Inc.*, 64 F. App'x 178, 182–83 (10th Cir. 2003) (performing a similar analysis where ConocoPhillips's right to assign work was "limited by other provisions in the Agreement" (quotation and alteration omitted)). We find this analysis does not constitute an improper review on the merits. The reviewing court may consider the entire CBA to determine whether a grievance implicates a particular provision, as dictated by the terms of Article 11, without actually reaching the merits of the grievance.

*2. Elimination-of-Jobs*

But we conclude it was not necessary to consult the other provisions of the CBA to determine whether Article 11 exempts elimination-of-jobs grievances that "involve" the reassignment-of-work. The assignment clause cannot be read so broadly. Because managerial decisions will frequently result in redistribution of work, the district court's interpretation would cause the single exception in Article 11 to swallow the entire provision. It is also obvious under the CBA that grievances regarding the elimination of a position and the reassignment of that position's duties are separable. For example, ConocoPhillips might have an absolute right to eliminate a position but face constraints in the way it reassigns the work of that position.

Thus, we will review only Article 11 to determine whether the Union's elimination-of-job grievances are expressly exempted from arbitration.

### C. The Arbitrability of the Union's Grievances Under the CBA

With this background, we address the arbitrability of each grievance raised by the Union on appeal.

### 1. Lead Operator Position

First, the Union lodged multiple grievances challenging ConocoPhillips's decision to eliminate the Lead Operator position and divide the work previously performed by this position between Unit Operators and APSs.[1]

---

[1] In the district court, the Union asserted these actions violated Articles 1, 3, 20-1, 20-4, 20-5, 20-6, 20-15, 21-1, 21-9, and Appendix A of the CBA. On

(continued...)

-10-

*Elimination of the Lead Operator Position*

As the district court noted, Article 11 vests management with absolute discretion to "[determine] the number of persons required to operate and maintain any portion or all of the physical plant," to "shut down any portion or all of the plant," to "determine and to redetermine the organization of the Ponca City Refinery," to "determine the methods, processes and materials to be employed," and to "discontinue in whole or in part processes or operations." App. at 260. Article 11 goes on to provide that grievances arising from these decisions are not subject to arbitration. *Id.* We find a grievance regarding elimination-of-jobs arises under the above-listed provisions, and is therefore exempt from arbitration under Article 11. Because this exemption is absolute, we need not consider any other provision of the CBA in reaching this conclusion.

*Reassignment of the Lead Operator Duties*

The exemption is not absolute as to reassignment-of-work. As set forth above, to determine whether Article 11 exempts a reassignment-of-work grievance from arbitration, we must consider whether the grievance implicates other provisions of the CBA.

---

[1](...continued)
appeal, the Union also claims these actions violated Articles 21-4 and 21-5. Because the 21-4 and 21-5 claims were not properly raised before the district court, we need not consider them here. *Tele-Commc'ns, Inc. v. C.I.R.*, 104 F.3d 1229, 1233 (10th Cir. 1997).

We agree with the district court that Articles 1, 3, 20-1, 20-4, 20-5, 20-6, 20-15, 21-9, and Appendix A are not implicated by the challenged reassignment. But we disagree as to Article 21-1. Because this provision limits ConocoPhillips's ability to reassign work, the question of whether it was violated by the reassignment of Lead Operator duties is arbitrable.

To reach this conclusion, we must consider each provision in light of the Union's grievance.

1.

*Article 1*, entitled "Recognition," provides that the Union is "the sole and exclusive representative for the purposes of collective bargaining in respect to rates of pay, wage, hours of employment and other conditions of employment . . . ." *Id.* at 258. The Union argues ConocoPhillips violated this provision when it assigned part of the work previously performed by a Union position (the Lead Operator) to a non-Union position (the APS). The Union also argues Article 1 was violated when ConocoPhillips made changes in the work assignment of Union employees without bargaining. We agree with the district court's conclusion that this provision is not implicated by the reassignment of Lead Operator work. Article 1 only mandates that the Union be the sole employee representative in negotiations with ConocoPhillips. It does not require that certain work be performed by Union employees or that any particular topic be subject to collective bargaining.

-12-

*Article 3*, entitled "Exclusive Agreement," provides:

> This contract is the entire Agreement between the [parties]. No practices, payments of wages or benefits prior to this Agreement date shall act to change or enlarge the express wording of this Agreement. All Agreements subsequently entered into by the parties during the term of this Agreement shall also be considered a part of this Agreement when reduced to writing and signed by authorized representatives of the Company and the Union.

*Id.* at 258. The Union contends when ConocoPhillips reassigned the work of the Lead Operator position, it "changed" the terms of the CBA without complying with Article 3's requirement that contract changes be reduced to a signed writing. This provision would be relevant if ConocoPhillips attempted to defend the reassignment on the theory that it was authorized by a new contract term. An arbitrator might then conclude that the new term was not valid under Article 3, and that ConocoPhillips's actions were unauthorized. But ConocoPhillips makes no such argument. And there is nothing in Article 3 that limits ConocoPhillips's ability to reassign work. We therefore find Article 3 is not implicated by the challenged reassignment.

The Union also argues the reassignment of Lead Operator work violated several provisions of *Article 20*, which it characterizes generally as "provid[ing] what the lead operators do and how the vacancies are filled." Aplt. Br. at 9. But

the Union does not make specific arguments as to how each provision was violated by the reassignment.[2]

*Article 20-1* states:  "Providing an employee has the necessary qualifications, seniority rating . . . shall be the determining factor in bidding and bumping.  Ranking number in a progression unit will be the determining factor for promoting or demoting within a progression unit or demoting out of a progression unit."  App. at 272.  In other words, Article 20-1 provides that seniority is to be the primary factor in advancement.  We find this provision imposes no limit on ConocoPhillips's ability to reassign work.

*Article 20-4* provides, in pertinent part:  "Filling a permanent vacancy in the Lead Operator classification shall be by the selection/qualification process.  All other permanent vacancies within a progression unit will be filled by the employees in the progression unit moving up, leaving the bottom number in the progression unit vacant."  *Id.*  The Union does not argue that a vacant position has been improperly filled, or explain how the reassignment of Lead Operator work offends Article 20-4.  We also find this provision is not relevant to the reassignment of work.

---

[2]  Before the district court, the Union made specific arguments that the elimination of the Lead Operator position violated each of these provisions.  But since we have found that elimination-of-jobs grievances are exempted absolutely by Article 11, we do not address these arguments.

*Article 20-5* addresses ConocoPhillips's ability to prevent an employee from advancing further according to seniority due to physical inability:

> No employee will be frozen unless the Company doctor determines he is physically unable to advance to the next higher classification. The period of time he is frozen will be limited to the time he is physically unable to advance. No more than one employee can be frozen in any classification. Employees promoting around a frozen employee shall also demote around him for the first calendar year. After one calendar year, if the employee remains frozen then he is subject to once around, always around, for any employee who promotes around him according to paragraph 20-12.

*Id.* at 273. Because this provision has no language limiting assignment in any way, we find it is not implicated by the reassignment of the Lead Operator work.

*Article 20-6* states: "It is recognized that employees must meet all qualifications of their job as a condition of employment," and sets out the guidelines for removing an employee who is not qualified to perform a job. *Id.* The Union does not argue that any employee was removed, or otherwise explain how ConocoPhillips's actions violated this provision. We find that Article 20-6 does not limit the reassignment of work.

*Article 20-15* discusses in detail the rules for advancement where an employee is demoted out of a position as a result of reductions in the unit. *Id.* at 275–76. We agree with the district court this provision contains no language restricting ConocoPhillips's ability to reassign work.

*Article 21-9* provides:

> If the work of a higher-paid classification is *temporarily* required for 4 or more hours of any employee within the bargaining unit during a regular 8-hour day, evening, or night shift, he shall receive the wages of the higher-paid classification for all hours worked in that shift. Overtime shall be paid for at rate of job worked.

*Id.* at 277 (emphasis added). The Union suggests ConocoPhillips violated Article 21-9 by reassigning Lead Operator work without making the mandatory increased payment to certain employees. But, as ConocoPhillips points out, Article 21-9 applies only to *temporary* reassignments. There is nothing in the record to suggest the reassignment of Lead Operator duties to Unit Operators and APSs is temporary. And, in fact, the Union does not make this contention. Thus, we conclude Article 21-9 is not implicated by the reassignment of Lead Operator work.

Finally, *Appendix A* is a rate schedule for Union jobs in the refinery. This provision explains: "This Appendix is the agreed-upon base rates of pay for the listed jobs as they existed at the time of the Agreement. It is not an agreement on the part of ConocoPhillips that the listed jobs will not be changed, combined, or eliminated." *Id.* at 291–92. The Union argued below the negotiated duties of the Lead Operator are fixed by Appendix A. But, as the district court noted, because this provision explicitly states the Appendix is not an agreement that the listed jobs will not be changed, this argument is unavailing. We therefore conclude Appendix A also does not narrow ConocoPhillips's right to reassign work.

To summarize, none of these provisions of the CBA are implicated by the Union's Lead Operator grievances.

2.

As to *Article 21-1*, however, the Union's contention has merit. Article 21-1 provides, in relevant part:

> Work peculiar to a classification shall be performed by employees assigned to that classification within the bargaining unit with the exception that the Company reserves the right to assign work without compromising safety to qualified employees regularly assigned to other classifications within the bargaining unit for efficient, productive and profitable operations of the plant.

*Id.* at 277. The Union contends the reassignment of work violated Article 21-1, because work peculiar to the Lead Operator classification is now being performed by the Unit Operator and APS classifications. In response, ConocoPhillips acknowledges that it is "generally prohibited" from reassigning the work of one classification to another. But, it argues, Article 21-1 limits reassignment only where the classification that originally performed the work still exists, as work cannot be "peculiar to" a classification that does not exist. Under this interpretation, Article 21-1 does not apply where ConocoPhillips has eliminated the original classification, as it did here.

We find the language of this provision arguably restricts ConocoPhillips's ability to reassign work previously performed by one classification to another. Such a reassignment is only permitted where it does not compromise safety, it is

-17-

made to qualified employees, and it is made to employees within the bargaining unit. The question of whether the reassignment of Lead Operator work complied with these limitations is for the arbitrator to resolve.

ConocoPhillips's narrow interpretation of this restriction is not unreasonable, but it is not required by the language of Article 21-1. It is not clear whether the provision's purpose is to protect the old classification from being stripped of duties (which would favor ConocoPhillips's interpretation, as there would be no value in protecting a classification that no longer exists) or to protect the new classification from being burdened with additional duties (which would favor a broader interpretation, as the burden of increased responsibility would be the same, regardless of whether the original classification was eliminated). Because the reassignment of the Lead Operator duties at least arguably implicates Article 21-1, we find this grievance is arbitrable.

In sum, we conclude Article 11 exempts every Lead Operator grievance from arbitration except the claim that the reassignment of Lead Operator duties violated Article 21-1 of the CBA.

## 2. Still Cleaner Unit

The Union also filed grievances based on ConocoPhillips's decision to (1) eliminate three positions in the Still Cleaner unit and replace them with two general Still Cleaners and (2) reassign some portion of the still cleanout preparation work to the newly created Drum Operator position in the

Coker/Combo unit. On appeal, the Union urges these actions violated Articles 21-1 and 36 of the CBA.[3]

*Elimination of the Three Still Cleaner Positions*

As discussed above, a grievance arising from ConocoPhillips's right to eliminate a position is exempt from arbitration under Article 11. The Still Cleaner grievances regarding the elimination of the original three positions are therefore not arbitrable.

*Reassignment of the Still Cleaner Work*

For the same reasons addressed above, Article 21-1 arguably places a limit on ConocoPhillips's ability to reassign work formerly performed by one classification to another. Thus, the grievance that the reassignment of Still Cleaner work to the Drum Operator violated Article 21-1 is arbitrable.

Finally, we turn to the Union's claim that the reassignment of Still Cleaner work to the Drum Operator position is contrary to Article 36. Article 36 addresses the payment and hours of employees who clean the stills. Specifically, Article 36 states, "Cleaning of the coke still equipment shall be paid for on a piecework basis . . . ." App. at 287. Article 36-2 continues that "[e]arnings of an entire crew per cleanout will be distributed among the crew in the same ratio as their base hourly rates bear to each other." *Id.* And Article 36-3 requires that

---

[3] The Union also asserts these actions violated Article 21-4. Again, however, we do not consider this claim because it was not properly raised before the district court. *Tele-Commc'ns, Inc.*, 104 F.3d at 1233.

-19-

overtime be paid "for each hour worked over 8 in a given cleanout" and "for each hour worked over 40 in a given workweek." *Id.* at 288. Article 36 also mandates that "hours shall not exceed 40 a week," and Article 36-1 explains that "[w]henever it appears that a delay will exceed 2 hours, the crew may be notified that they are not needed; and they may leave the premises until called again." *Id.* at 287.

It is undisputed the Drum Operator position does not comply with these requirements. The Union contends the reassignment of Still Cleaner work to an employee who is not paid or employed in accordance with Article 36 is a violation of the CBA. ConocoPhillips, echoing the findings of the district court, responds that Article 36 applies only to workers employed in the Still Cleaning unit. Because the Drum Operator is located in the Coker/Combo unit, ConocoPhillips argues, Article 36 is not operative.

The text of Article 36 does not support ConocoPhillips's interpretation. By its own terms, Article 36 regulates payment and hours for "[c]leaning of the coke still equipment." *Id.* Article 36-9 defines still cleaning duties as including "the actual preparation of the equipment for cleaning." *Id.* at 288. Because ConocoPhillips concedes the Drum Operator performs "cleanout preparation work," which includes "isolating energy before the coke equipment can be properly disassembled," Aple. Br. at 8, Article 36 arguably applies to the Drum

-20-

Operators.  Thus, the Union's grievance that the reassignment of Still Cleaner work to the Drum Operators violated Article 36 is arbitrable.

To conclude, the Union's Still Cleaner reassignment grievances under Articles 21-1 and 36 are not exempted from arbitration by Article 11 of the CBA.

3.  The Tester Position

The Union's final grievances relate to the elimination of one Tester position and the reassignment of this position's work as a violation of various provisions of the CBA.

*Elimination of the Tester Position*

As discussed above, Article 11 expressly exempts from arbitration any grievance arising from management's elimination of a position.  For this reason, grievances regarding the elimination of the Tester position are not arbitrable under the CBA.

*Reassignment of the Tester Duties*

The parties disagree as to whether the elimination of the Tester position resulted in a reassignment of the duties previously performed by that position. The district court found no reassignment had taken place, crediting ConocoPhillips's claim that improved efficiencies made reassignment of these duties unnecessary.  But the Union argues the evidence in the record shows a genuine issue of fact as to whether there was a reassignment.  In support, the Union cites the deposition testimony of a Union representative:  "And we didn't

-21-

feel like [] the [Tester] position should be eliminated and the work divided among the other lab people. . . . and [ConocoPhillips] refused to acknowledge that their work wasn't going away; it was just being reassigned to another person." App. at 324–35.

But the Union did not rely on this evidence in resisting summary judgment below. Even if the testimony had probative value (which is doubtful given its conclusory nature), the Union cannot now rely on it on appeal. Once ConocoPhillips pointed out the deficiency in the Union's case in district court, it was the Union's burden to show the existence of a genuine issue of fact by pointing to affidavits, depositions, and exhibits in the record. *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1199 (10th Cir. 2000). "Where the burden to present such specific facts was not adequately met below, we will not reverse a district court for failing to uncover them itself." *Id.* (quotations and alterations omitted).

### III. Conclusion

For the foregoing reasons, we find the Union's grievances that the reassignment of Lead Operator work violated Article 21-1 and the reassignment of Still Cleaner work violated Articles 21-1 and 36 are arbitrable under the CBA.

Accordingly, we AFFIRM in part and REVERSE in part the judgment of the district court.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Circuit Judge